1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COSTCO WHOLESALE CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Defendant. | **CASE NO. 06CV2377  IEG (NLS)**<br><br>**ORDER (1) DENYING DEFENDANT'S MOTION TO TRANSFER AND (2) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Doc. Nos. 8, 9, 10] |

Presently before the Court is Liberty Mutual's ("defendant") motion to transfer the case to the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1404(a) [Doc. Nos. 8-9], and Costco Wholesale's ("plaintiff") motion for partial summary judgment on its claim for breach of the contractual duty to defend.  [Doc. No. 10.]

**A.     Factual Background**

　　　1.     CDS Agreement

Plaintiff, along with The Price Company ("Price"), owns and operates a nationwide warehouse merchandising business.  (Compl. ¶ 9.)  Vendors use plaintiff's warehouses for product demonstrations.  (Id.)  Club Demonstration Services ("CDS") is a corporation in the business of organizing and conducting product demonstrations. (Id. ¶ 10.)  On September 4, 2000, plaintiff, Price, and CDS entered a one-year agreement allowing CDS to perform food product

1   demonstrations at plaintiff's warehouses nationwide ("CDS Agreement").  (Id. ¶ 12 & Exhibit A.)

2          Under its "Insurance and Indemnification" section, the CDS Agreement obligated CDS to

3          indemnify, defend and hold Costco Wholesale harmless from and against all
           liabilities, damages to person or property, death or injury, losses, claims (including
4          claims against Costco Wholesale by CDS employees), and expenses (including
           attorney's fees) . . . , except to the extent such damage is caused by the sole
5          negligence of Costco Wholesale.

6   (Id., Exhibit A, ¶ 8(a).)  Specifically, CDS would procure a liability insurance policy with

7   "minimum primary limits of $2,000,000 combined single limit," along with an endorsement

8   naming plaintiff and Price as additional named insureds.  (Id., Exhibit A, ¶ 8(c).))

9          2.     The Policy

10          Defendant issued a policy of commercial general liability insurance for the policy term of

11   September 7, 2000 through September 7, 2001, with coverage limits of $1 million per occurrence

12   and $2 million aggregate ("Policy").  (Benson Decla. ¶ 4.)  The Policy[1] named CDS and its parent

13   corporation, Daymon Associates ("Daymon"), as named insureds.  (Policy, Commercial General

14   Liability Declarations, and Named Insured Endorsement.)  The Policy obligated defendant to "pay

15   those sums that the insured becomes legally obligated to pay as damages because of 'bodily

16   injury' or 'property damage' to which this insurance applies" and "to defend the insured against

17   any 'suit' seeking those damages."  (Amendment of Insuring Agreement–Known Injury or

18   Damage.)  The Policy named plaintiff and Price as additional insureds, "but only with respect to

19   liability arising out of [CDS's] operations."  (Additional Insured–Designated Person or

20   Organization.)

21          The Policy contained an employer's liability exclusion for "bodily injury" to "[a]n

22   'employee' of the insured arising out of and in the course of: (a) [e]mployment by the insured; or

23   (b) [p]erforming duties related to the conduct of the insured's business."  (Commercial General

24   Liability Coverage Form, § 1, ¶ 2(e).)  The Policy also contains a severability clause, applying the

25   insurance "[a]s if each Named Insured were the only Named Insured" and "[s]eparately to each

26   insured against whom claim is made or 'suit' is brought."  (Id. § 4, ¶ 7.)

27   _____

28          [1] The Policy is Exhibit B to the Complaint and consists of a series of form documents.  Plaintiff
     did not paginate the exhibit.  Therefore, the Court cites to specific documents within the Policy.

### 3.     Kuo Complaint

On August 24, 2001, during the term of both the CDS Agreement and the Policy, John Kuo, a CDS sales advisor, tripped on discarded packaging tape while pushing a cart out of plaintiff's warehouse in King of Prussia, Pennsylvania.  (Kuo Compl. ¶ 4.)  On August 22, 2003 Kuo filed a complaint against plaintiff in the Montgomery County Court of Common Pleas[2] for bodily injuries allegedly resulting from plaintiff's negligence.  (Id. ¶ 16.)

On September 3, 2003, Jan Carpenter, senior examiner for Sedgwick CMS (plaintiff's third-party claims administrator) faxed a copy of the Kuo Complaint to Janice Walker, CDS risk manager, and tendered Kuo's claim to CDS "for future handling and to defend and indemnify Costco."  (Compl., Exhibit D.)  On September 9, 2003, Ms. Carpenter faxed a second letter to Ms. Walker reiterating the request for defense and indemnity.  (Id., Exhibit E.)  While awaiting a response, plaintiff retained an attorney to obtain a thirty-day extension to answer the complaint.  (Id. ¶ 31 & Exhibit F.)  On September 19, 2003, Ms. Carpenter faxed a third letter to Ms. Walker asking CDS to "advise [its] position as soon as possible."  (Id., Exhibit F.)

On October 8, 2003, Rita Spalletti, defendant's claims case manager, wrote to Ms. Carpenter that defendant would not assume plaintiff's defense or indemnification.  (Id., Exhibit H.)  Ms. Spalletti first cited the employer's liability exclusion, which "[u]nder Pennsylvania law . . . negates coverage for all claims involving 'bodily injury' to an 'employee' of the named insured, even if the party seeking coverage is an additional insured rather than a named insured."  (Id.)  Because Mr. Kuo was employed by CDS (the named insured), the employer's liability exclusion denied coverage to plaintiff (the additional insured).  The second basis for denying coverage was the indemnification clause in the CDS Agreement, which imposed no obligation on CDS to indemnify plaintiff for claims involving plaintiff's "sole negligence."  (Id.)  Because plaintiff was the only party alleged to be negligent, CDS (and, therefore, defendant) had no obligation to indemnify plaintiff. (Id.)

On October 14, 2003, Ms. Carpenter faxed a letter to Ms. Spalletti, disputing whether the

---

[2] King of Prussia and Montgomery County are within the boundaries of the federal Eastern District of Pennsylvania.

1  allegations in the Kuo complaint arose from plaintiff's "sole negligence."[3]  (Id., Exhibit I.)

2  Furthermore, if forced to pay for its own defense in the Kuo litigation, plaintiff claimed it would

3  seek reimbursement and indemnification from CDS and/or sue CDS for breach of contract.  (Id.)

4  In a November 12, 2003 letter, Ms. Spalletti stated defendant would not defend and

5  indemnify plaintiff on the basis of plaintiff's contention that Kuo was contributorily negligent.

6  (Id., Exhibit J.)  Regardless of the scope of the CDS Agreement's indemnification clause,

7  defendant denied an obligation to indemnify plaintiff in its capacity as CDS's indemnitee.  (Id.)

8  Per defendant, the Policy obligated a defense of the named insured's indemnitee only when the

9  named insured was a co-defendant in the litigation.  (Id.)

10  On April 7, 2004, Ms. Carpenter faxed a final letter to Ms. Spalletti rejecting defendant's

11  contention that plaintiff had to prove Kuo's contributory negligence before defendant's duties of

12  defense and indemnification arose.  (Id., Exhibit K.)  Defendant never responded to this letter.  (Id.

13  ¶ 58.)

14  Because defendant would not defend plaintiff in the Kuo litigation, plaintiff retained its

15  own defense counsel, incurring attorney's fees and costs.  (Lufkin Decla. ¶ 24.)  The Kuo litigation

16  is ongoing.  (Id.)

17  Prior to the incident giving rise to the Kuo Complaint, defendant indemnified or defended

18  plaintiff against at least six lawsuits filed by CDS employees for bodily injuries.  (Id. ¶ 17.)

19  Defendant undertook these defenses pursuant either to the Policy or similar policies issued in each

20  of the two preceding policy periods.  (Id.)  All six lawsuits arose from an incident in a state other

21  than Pennsylvania.  (Id. ¶¶ 17-20.)

22  **B.      Procedural Background**

23  On October 26, 2006, plaintiff filed the complaint, alleging breaches of (1) the duty to

24  defend, (2) the duty to indemnify, and (3) the implied covenant of good faith and fair dealing.

25  (Compl.; Doc. No. 1.)  The first cause of action alleged the Policy imposed a duty on defendant to

26  defend plaintiff in the Kuo litigation.  (Id. ¶ 60.)  Defendant allegedly breached by its refusal to

27

28  _____

[3] In its answer to the Kuo Complaint, plaintiff asserted Kuo was contributorily negligent.
(Lufkin Decla., Exhibit 1, ¶ 24.)

1   defend, despite plaintiff's repeated demand.  (Id. ¶ 62.)  As remedies, plaintiff seeks monetary

2   damages, including attorney's fees and costs incurred in the Kuo litigation.  (Id. ¶ 63.)

3           Defendant answered the complaint on November 20, 2006.  (Doc. No. 5.)

4           On November 22, 2006, defendant filed its motion to transfer to the Eastern District of

5   Pennsylvania, pursuant to 28 U.S.C. § 1404(a).  (Doc. Nos. 8-9.)

6           On December 18, 2006, plaintiff filed its motion for partial summary judgment on the first

7   cause of action for breach of the duty to defend.  (Doc. No. 10.)

8           Defendant filed its opposition to plaintiff's motion for summary judgment on December

9   29, 2006.  (Doc. No. 11.)  Plaintiff filed its opposition to defendant's motion to change venue on

10  January 2, 2007.  (Doc. No. 12.)

11          On January 8, 2007, each party filed its reply to the respective motions.  (Doc. Nos. 13-14.)

12  The Court held oral argument on the motions on January 16, 2007 and then took the matter under

13  submission.

14                                  **MOTION TO TRANSFER**

15  **A.      Legal Standard**

16          Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest

17  of justice, a district court may transfer any civil action to any other district or division where it

18  might have been brought."  Here, defendant seeks to transfer this action to the Eastern District of

19  Pennsylvania ("EDPA").

20          Defendant, as the moving party, carries the burden of showing transfer is appropriate.

21  Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 279 (9th Cir. 1979); DeFazio v.

22  Hollister Employee Share Ownership Trust, 406 F. Supp. 2d 1085, 1088 (E.D. Cal. 2005).  To

23  satisfy its burden, defendant must show (1) venue is proper in this district,[4] (2) plaintiff could have

24  brought this action in EDPA,[5] and (3) transfer "will serve the convenience of the parties and

25  witnesses and will promote the interest of justice."  Goodyear Tire & Rubber Co. v. McDonnell

26  ────────────────

27          [4] Defendant establishes venue is proper in this district because defendant does business in
    California and is, therefore, subject to personal jurisdiction here.  (Def. Memo ISO Transfer, at 4.)

28          [5] Plaintiff concedes, and the Court finds, this action could have been brought in EDPA.  (Pl.
    Opp. to Transfer, at 5.)

06cv2377

1  Douglas Corp., 820 F. Supp. 503, 506 (C.D. Cal. 1992).

2      The Ninth Circuit employs a multi-factor test for analyzing a motion to transfer:[6]

3          (1) the location where the relevant agreements were negotiated and executed, (2)
           the state that is most familiar with the governing law, (3) the plaintiff's choice of
4          forum, (4) the respective parties' contacts with the forum, (5) the contacts relating
           to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs
5          of litigation in the two forums, (7) the availability of compulsory process to compel
           the attendance of unwilling non-party witnesses, and (8) the ease of access to
6          sources of proof.

7  Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); Television Events & Mktg.,

8  Inc. v. Amcon Distrib. Co., 416 F. Supp. 2d 948, 970 (D. Haw. 2006).

9  **B.      Analysis**

10      1.      Location of Relevant Agreements

11      The negotiation and execution of the Policy does not support transfer.  Daymon accepted

12  the Policy on CDS's behalf in Connecticut through a Connecticut broker.  (Pl. Memo. ISO MSJ, at

13  10.)  Plaintiff assumes (and defendant does not dispute) defendant signed the Policy in

14  Massachusetts (defendant's domicile).  (Id.)  None of these events took place in Pennsylvania.

15      While the Policy is by far the most relevant agreement, the trier of fact may consider the

16  CDS Agreement to determine the reasonable expectations of the contracting parties.  CDS

17  included plaintiff as an additional insured on the Policy because of CDS's obligations under the

18  CDS Agreement.  (Compl., Exhibit A, ¶ 8(C).)  CDS, plaintiff, and Price[7] negotiated and executed

19  the CDS Agreement in San Diego.  (Pl. Opp to Transfer, at 2.)  None of these events took place in

20  Pennsylvania.

21      Therefore, this factor weighs against transfer because the relevant agreements were neither

22  negotiated nor executed in Pennsylvania, but one potentially relevant agreement was negotiated

23  and executed in California.

24

25      [6] The parties do not cite this test, instead limiting their analysis to plaintiff's choice of forum
    along with the three statutory factors (convenience of parties, convenience of witnesses, interest of
26  justice).  L.A. Mem'l Coliseum v. Nat'l Football League, 89 F.R.D. 497, 499 (C.D. Cal. 1981).
    However, the parties' briefing is sufficiently thorough to enable the Court to apply all factors of the
27  Jones test.

28      [7] Because Price is not connected to the facts giving rise to the Kuo litigation or this case, the
    Court assigns no weight to Price's purported interests in this case.  (See Pl. Opp. to Transfer, at 7.)

1

2.    Governing Law

2

A diversity case should be litigated "in a forum that is at home with the law that must

3

govern the action[.]"  Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir.

4

1986); DIRECTV, Inc. v. EQ Stuff, Inc., 207 F. Supp. 2d 1077, 1083 (C.D. Cal. 2002).  According

5

to defendant, transfer is appropriate here because EDPA is more familiar with Pennsylvania law on

6

the scope of employer's liability exclusions.

7

Defendant's argument proceeds from the faulty premise that Pennsylvania's substantive

8

law definitely applies.  As explained in the Court's discussion infra of plaintiff's summary

9

judgment motion, Pennsylvania law does not automatically govern this coverage dispute simply

10

because the underlying tort happened there.

11

Instead, the only law that definitely applies here is California's choice-of-law rules.  Those

12

rules apply if the Court keeps the case here.  See Arno v. Club Med, Inc., 22 F.3d 1464, 1467 (9th

13

Cir. 1994) (federal court sitting in diversity applies the choice-of-law rules of the forum state).

14

And, these rules would still apply if the Court transferred the case to EDPA.[8]  See Muldoon v.

15

Tropitone Furniture Co., 1 F.3d 964, 965 (9th Cir. 1993) (citing Van Dusen v. Barrack, 376 U.S.

16

612 (1964)) (§1404(a) transferee court applies choice-of-law rules of transferor court).  This Court

17

is more familiar with California's choice-of-law rules than EDPA.  Therefore, this factor weighs

18

against transfer.

19

3.    Choice of Forum

20

"The defendant must make a strong showing of inconvenience to warrant upsetting the

21

plaintiff's choice of forum."  Decker Coal, 805 F.2d at 843.  However, "[i]f the operative facts

22

have not occurred within the forum and the forum has no interest in the parties or subject matter,"

23

the plaintiff's choice receives "minimal consideration."  Lou v. Belzberg, 834 F.2d 730, 739 (9th

24

25

[8] Even if Pennsylvania's choice-of-law rules governed after transfer, they would not guarantee the application of Pennsylvania's substantive law.  Where an insurance coverage dispute is connected to Pennsylvania only because the underlying loss and litigation occurred there, courts applying Pennsylvania's choice-of-law rules have found that another state's law controls.  Gen. Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379-80 (3d Cir. 1992); Gould Inc. v. Cont'l Cas. Co., 822 F. Supp. 1172, 1176 (E.D. Pa. 1993).  Therefore, defendant cannot argue that plaintiff filed its action in this Court to avoid application of an unfavorable rule of law.  Even if plaintiff filed in EDPA, plaintiff could have persuaded that court not to apply Pennsylvania law.

26

27

28

Cir. 1987); see Saleh v. Titan Corp., 361 F. Supp. 2d 1152, 1157 (S.D. Cal. 2005) (plaintiff's choice receives less deference "where the action has little connection with the chosen forum").

Applied to these facts, plaintiff's choice of forum receives less deference because California is not plaintiff's domicile. Pergo, Inc. v. Alloc, Inc., 262 F. Supp. 2d 122, 129 (S.D.N.Y. 2003); Cambridge Filter Corp. v. Int'l Filter Co., 548 F. Supp. 1308, 1311 (D. Nev. 1982). California also has no interest in the parties or subject matter as relates to the facts of this case.[9] Some of the operative facts took place here, including the negotiation of the CDS Agreement and plaintiff's initial tender of the Kuo complaint to CDS. More significant facts, however, took place elsewhere, including the execution of the Policy (Connecticut) and defendant's refusal to defend the Kuo litigation (Pennsylvania).

Beyond pointing out the tenuous connections to the Southern District, defendant alleges plaintiff is "forum-shopping" because plaintiff did not file in EDPA. In its opposition and at oral argument, defendant asserts plaintiff must be avoiding Pennsylvania law because a lawsuit for breach of insurance contract is typically brought in the state where the loss occurred.

Defendant overstates its forum-shopping allegation in two ways. First, as discussed under the previous factor, defendant overzealously concludes Pennsylvania law must apply in this action. Because of all the contract negotiations in other states between nationwide entities, plaintiff could not have known that Pennsylvania law would definitely apply when plaintiff brought this coverage dispute. Second, while the loss occurred in Pennsylvania, the Southern District has some connection to this litigation because the CDS Agreement (which triggered the endorsement naming plaintiff as an additional insured on the Policy) was negotiated in San Diego. By contrast, forum-shopping happens when the plaintiff is "gaming" the venue inquiry, e.g., by purporting to relocate its business to the forum state a few weeks before filing the complaint but without registering with the forum state's secretary of state or listing the change in principal place of business on the company website. Inherent.com v. Martindale-Hubbell, 420 F. Supp. 2d 1093,

---

[9] I.e., California has an interest in the parties because they are nationwide entities doing business in California. And, California has an interest in the Policy when torts giving rise to coverage occur in California. However, California has no interest in torts in other states arising from the parties' business practices within those states.

1    1100-01 (N.D. Cal. 2006).  Here, while the Court assigns minimal weight to plaintiff's choice of

2    forum, it declines to find that plaintiff forum-shopped by filing in the Southern District.

3          4.      Parties' Contacts with Forum

4          As nationwide entities, plaintiff and defendant both do business in California.  Likewise,

5    they do business in Pennsylvania.  However, neither California nor Pennsylvania is the state of

6    incorporation or principal place of business for either party.  Because the parties have no greater

7    contact with Pennsylvania than California, this factor weighs against transfer.

8          5.      Cause of Action's Contacts with Forum

9          Pennsylvania's contacts with this litigation include Kuo's injury, the Kuo litigation, and

10   defendant's receipt and rejection of the tendered claim.  (Memo. ISO Transfer, at 4.)  As the situs

11   of the underlying tort, EDPA has contacts to this dispute for breach of contract.

12         Defendant overbroadly asserts the Southern District, by contrast, lacks any connection to

13   this case.  (Id.)  To the contrary, plaintiff first tendered the Kuo lawsuit for defense and indemnity

14   through CDS by sending letters to CDS risk managers in San Diego.  (Compl. ¶¶ 25, 28, 32.)  CDS

15   and defendant included plaintiff as an additional insured on the Policy because of contractual

16   obligations assumed in the CDS Agreement, also negotiated in San Diego.  (See Compl., Exhibit

17   A, ¶ 8(C).)

18         Furthermore, a dispute over contract interpretation raises separate legal issues that do not

19   overlap with Kuo's underlying tort claim.  The focus of this dispute is the Policy, rather than

20   plaintiff's conduct giving rise to the Kuo litigation.  A district court refused to transfer an

21   insurance coverage dispute to the district where the tort claims were pending because Oregon, the

22   plaintiff's chosen forum, was the home state of the brokers and the insured.  Home Indemnity Co.

23   v. Stimson Lumber Co., 229 F. Supp. 2d 1075, 1084 (D. Or. 2001). Therefore, the relevant

24   witnesses (i.e., those who could explain the intended meaning of the contract when the parties

25   executed the policy) lived in Oregon.  Id.

26         Applied to these facts, the witnesses who can present extrinsic evidence to explain any

27   ambiguities in Policy language live either in Connecticut (CDS's state of incorporation, Daymon's

28   principal place of business), Massachusetts (defendant's domicile), or California (CDS's principal

1  place of business).  If the Court must turn to the CDS Agreement to interpret the Policy, the

2  relevant witnesses would live in Connecticut, California, or Washington (plaintiff's domicile).  By

3  contrast, defendant's claims processing personnel in Pennsylvania who specifically handled the

4  Kuo tender are unlikely to testify regarding the parties' intent when they entered into the Policy.

5  Therefore, Pennsylvania's contacts with the cause of action are more attenuated than they initially

6  seem.[10]  This factor weighs slightly in favor of transfer.

7          6.      Costs of Litigation

8          Both plaintiff and defendant are large corporations capable of litigating in virtually any

9  federal district court in the country.  Furthermore, whether the action remains in the Southern

10  District or is transferred to EDPA, both parties will incur the costs of litigating away from their

11  respective domiciles.  This factor weighs against transfer because litigation in EDPA would not

12  substantially reduce the costs of litigation to both parties.

13          7.      Unwilling Non-Party Witnesses

14          Convenience of witnesses is often the most important factor in a § 1404(a) transfer motion.

15  Nat'l Football League, 89 F.R.D. at 501.  In establishing inconvenience to witnesses, the moving

16  party must name the witnesses, state their location, and explain their testimony and its relevance.

17  Carolina Cas. Co. v. Data Broad. Corp., 158 F. Supp. 2d 1044, 1049 (N.D. Cal. 2001); Williams v.

18  Bowman, 157 F. Supp. 2d 1103, 1108 (N.D. Cal. 2001).  The court "consider[s] not simply how

19  many witnesses each side has and the location of each, but also the importance of the witnesses[.]"

20  Saleh, 361 F. Supp. 2d at 1165; accord Ramsey v. Fox News Network, LLC, 323 F. Supp. 2d

21  1352, 1356-57 (N.D. Ga. 2004).  "Convenience of witnesses" includes both non-party witnesses

22  outside the scope of the Court's subpoena power and the geographic location of any witnesses

23  likely to testify in this case.

24              a.      Non-party Witnesses Outside Court's Subpoena Power

25          A party can compel the testimony of its employees at trial.  Boutte v. Cenac Towing, Inc.,

26

27          [10] Furthermore, the parties agree on most of the facts, and the duty to defend is purely a
question of law.  See Stuart v. Mobile ESPN, No. C 06-02094 SI, 2006 WL 2433416, at *2 (N.D. Cal.
28  Aug. 21, 2006) (place of underlying facts less important when question presented is "purely legal").

1   346 F. Supp. 2d 922, 933 (S.D. Tex. 2004); <u>STX, Inc. v. Trik Stik, Inc.</u>, 708 F. Supp. 1551, 1556

2   (N.D. Cal. 1988).  For non-party witnesses, the court's subpoena power extends to anywhere

3   within the district and/or one hundred miles of the place of trial.  Fed. R. Civ. P. 45(b)(2).

4       According to defendant, critical witnesses in this case include Mr. Kuo; Mr. Richard

5   Sutton, Ms. Spalletti's former supervisor who no longer works for defendant; and Mr. Warren

6   Sperling, who entered an appearance on plaintiff's behalf in the Kuo litigation.  (Def. Memo ISO

7   Transfer, at 8-9.)  Mr. Kuo can testify regarding his underlying lawsuit against plaintiff.  (<u>Id.</u> at 8.)

8   Mr. Sutton can testify regarding defendant's denial of plaintiff's tender of defense of the Kuo

9   litigation.  (<u>Id.</u>)  Mr. Sperling can testify about his legal work on plaintiff's behalf, which relates to

10  plaintiff's claim for reimbursement of defense fees.  (<u>Id.</u>, at 8-9.)

11      Defendant asserts other, unnamed witnesses may be necessary to testify to the conditions

12  of plaintiff's warehouse in King of Prussia.  (<u>Id.</u> at 8.)  These witnesses would likely reside in

13  Pennsylvania.  However, the Court cannot consider these witnesses because defendant fails to

14  identify them.[11]  <u>See</u> <u>Saleh</u>, 361 F. Supp. 2d at 1166 (holding that speculation regarding the

15  necessity of unspecified individuals' testimony is insufficient).

16      According to plaintiff, critical witnesses in this case include Ms. Walker and Mr. Frank

17  Cohenhour, CDS's president.  (Pl. Opp. to Transfer, at 10.)  Ms. Walker would testify to CDS's

18  efforts to persuade defendant to provide a defense of the Kuo Complaint.  (<u>Id.</u> at 11.) She also can

19  testify regarding the prior instances when defendant provided a defense for plaintiff.  (<u>Id.</u>)  Mr.

20  Cohenhour would testify to defendant's knowledge of the CDS Agreement when defendant issued

21  the Policy, and CDS's reasonable expectations of the Policy's coverage scope.  (<u>Id.</u> at 12.)

22  However, neither Ms. Walker nor Mr. Cohenhour can testify voluntarily because the Policy

23

24

25

26

27      [11] The Court is also unpersuaded these unnamed witnesses would offer relevant testimony. Defendant claims their trial testimony would be relevant on defendant's alleged breach of the duty to indemnify because they would establish whether plaintiff's "sole negligence" was the cause of Mr.

28  Kuo's injuries. However, the underlying Kuo litigation in Pennsylvania state court, rather than a rehashing of that dispute in this Court, will determine the cause of Mr. Kuo's injuries.

1  contains a cooperation clause.[12]  (Schluederberg Decla. ¶ 7.)  Because Ms. Walker and Ms.

2  Cohenhour reside in San Diego (Id. ¶ 8(a)-(b)), transferring the case to EDPA would effectively

3  make them unavailable for trial.

4      To establish unavailability, a party need not affirmatively demonstrate that non-party

5  witnesses are unable to travel to a forum.  Saleh, 361 F. Supp. 2d at 1162.  Therefore, despite

6  defendant's evidentiary objections,[13] the Court must analyze the comparative importance of non-

7  party witnesses beyond the subpoena power of the respective courts[14].

8      The Court finds the testimony of witnesses beyond the scope of EDPA's subpoena power

9  is more important than the testimony of witnesses beyond the scope of this Court's subpoena

10  power.  This lawsuit requires the interpretation of the Policy and, potentially, the CDS Agreement.

11  Mr. Cohenhour can testify as to CDS's negotiations with defendant concerning the Policy (under

12  which plaintiff seeks coverage), and with plaintiff concerning the CDS Agreement (in which CDS

13  committed to include plaintiff as an additional named insured on the Policy).  That testimony

14  would assist the trier of fact in determining the parties' reasonable expectations as to the meaning

15  of those agreements at the time of contracting.  Ms. Walker's testimony about the parties' prior

16  course of conduct would assist the Court in determining the parties' understanding of the

17  _____

18  [12] To avoid inducing Ms. Walker and Mr. Cohenhour to breach the cooperation clause, plaintiff
19  provides their potential trial testimony through the declaration of Peter Q. Schluederberg, who spoke with Ms. Walker by phone.

20  [13] Defendant objects to the Schluederberg declaration as inadmissible hearsay because it does
21  not establish that Ms. Walker and Mr. Cohenhour are "unavailable" under Federal Rule of Evidence 804.  However, in its review of § 1404(a) case law, the Court found no instance in which a court
22  refused to conduct the convenience of witnesses' inquiry because the litigants failed to establish Rule 804 unavailability.  If that were a prerequisite, the Court could not consider defendant's critical
23  witnesses because defendant has submitted no admissible evidence that Mr. Kuo, Mr. Sutton, or Mr. Sperling is "unavailable" under Rule 804.

24  Indisputably, if the Court grants defendant's motion to transfer, Ms. Walker and Mr.
25  Cohenhour will be beyond EDPA's subpoena power.  That is the only pertinent consideration for the Court's analysis.  Offering unavailable witnesses' testimony via videotaped deposition testimony is
26  disfavored because "[a] party should not be forced to rely on 'trial by deposition' rather than live witnesses."  B.J. McAdams, Inc. v. Boggs, 426 F. Supp. 1091, 1105 (E.D. Pa. 1977); accord Owner-
27  Operator Indep. Drivers Ass'n, Inc. v. C.R. England, Inc., No. CV F 02-5664 AWI SMS, 2002 WL 32831640, at *9 (E.D. Cal. Aug. 19, 2002).

28  [14] The Court does not analyze the importance of witnesses beyond the subpoena power of both
courts because transfer would have no effect on their unavailability.

1    agreements' meaning during the Policy term.

2        None of the witnesses beyond the subpoena power of this Court can provide similar

3    testimony to elucidate the meaning of the Policy or the CDS Agreement.  Mr. Kuo had no role in

4    the negotiation, execution, or past performance of those agreements.  Instead, he can testify only

5    about the events giving rise to his tort claim and the result of that lawsuit. Mr. Sutton can explain

6    the events giving rise to defendant's refusal to defend the Kuo lawsuit, but that testimony is less

7    helpful in understanding the Policy's intended meaning at the time of contracting or during the

8    previous instances when defendant provided a defense.  Also, Mr. Sutton's testimony would be

9    redundant with the testimony of Ms. Spalletti, the sole author of the letters informing Ms.

10   Carpenter of defendant's decision to deny coverage.  Finally, Mr. Sperling's testimony would be

11   relevant on a narrow damages issue, a question the trier of fact would never reach if it agreed with

12   defendant's contract interpretation.

13                    *b.    Convenience of All Witnesses*

14       Transfer is inappropriate where it "would merely shift rather than eliminate the

15   inconvenience."  Decker Coal, 805 F.2d at 843; see Dual Lock Partition Sys., Inc. v. Ridgeview

16   Glass, Inc., 877 F. Supp. 1432, 1438-39 (D. Or. 1995) (applying the Decker Coal rule to deny

17   transfer of contract action to Maryland because Oregon plaintiff had most of its damages witnesses

18   in Oregon).  Applied to litigation between a Washington plaintiff and a Massachusetts defendant, a

19   cross-country transfer would impermissibly shift inconvenience from defendant to plaintiff.

20       Therefore, the Court rejects defendant's argument that Ms. Walker and Mr. Cohenhour are

21   not critical witnesses because plaintiff can call other witnesses to testify to the same facts.  (See

22   Def. Transfer Reply, at 6, 8.)  This claim, even if true, is irrelevant.  For example, if plaintiff did

23   not call Ms. Walker to testify about the parties' prior course of conduct, plaintiff would likely call

24   Ms. Carpenter or Ms. Norma Lufkin, plaintiff's casualty supervisor.  Ms. Carpenter resides in

25   Portland, Oregon (Compl., Exhibit H), and Ms. Lufkin resides in Issaquah, Washington (Lufkin

26   Decla., at 6).  A West Coast forum is more convenient for these witnesses than an East Coast

27   forum.  While transporting witnesses from the Northeast to San Diego no doubt inconveniences

28   defendant, the Court cannot grant a transfer that would effectively shift the inconvenience onto

1    plaintiff.

2          8.      Access to Proof

3          In the typical inquiry under this prong, "courts look at the location of records and

4    documents." DeFazio, 406 F. Supp. 2d at 1091 (citing Jones, 211 F.3d at 499, and Decker Coal,

5    805 F.2d at 843).  Here, however, defendant does not claim any difficulty in transferring

6    documentary evidence from its Pennsylvania and Massachusetts offices to the Southern District.

7    Instead, defendant claims a jury trial of this case might require counsel and expert witnesses to

8    tour plaintiff's warehouse in King of Prussia, Pennsylvania.  (Def. Memo. ISO Transfer, at 8 n.4.)

9          This factor does not support transfer because the convenience of expert witnesses carries

10   little or no weight.  See Forcillo v. LeMond Fitness, 220 F.R.D. 550, 553 (S.D. Ill. 2004) (experts

11   can be found in any district); One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp., 312 F.

12   Supp. 2d 824, 831 (E.D. Va. 2004) (experts can be fully compensated, while fact witnesses receive

13   limited compensation).  Furthermore, because § 1404(a) makes no reference to counsel, the

14   convenience of counsel is irrelevant.[15]  In re Volkswagen AG, 371 F.3d 201, 206 (5th Cir. 2004);

15   Ready Transp., Inc. v. AAR Mfg., Inc., No. 02:06-cv-1053-GEB-KJM, 2006 WL 2131308, at *5

16   (E.D. Cal. July 27, 2006).

17         9.      Congestion

18         In addition to the Jones factors, courts also consider the relative docket congestion of the

19   current forum and the transferee district.  Here, defendant shows EDPA is about five months

20   quicker in terms of the median time from filing to disposition or trial.  (Def. Memo ISO Transfer,

21   at 9-10.)

22         The key inquiry in docket congestion is "whether a trial may be speedier in another court

23   because of its less crowded docket."  Saleh, 361 F. Supp. 2d at 1167 (quoting Gates Learjet Corp.

24   v. Jensen, 743 F.2d 1325, 1337 (9th Cir. 1984)).  Applied to these facts, the parties are unlikely to

25   receive a speedier trial by transfer to EDPA.  Less than a month after defendant answered the

26

27        [15] Defendant alleges the site tour would be necessary to determine the applicability of the "sole
     negligence" provision in the CDS Agreement's indemnification clause.  The Pennsylvania Court of
28   Common Pleas will decide all questions of negligence and comparative fault.  Even if the convenience
     of experts and counsel carried greater weight, defendant fails to show how the Court would have
     jurisdiction to relitigate the question of plaintiff's negligence. Therefore, a site tour is irrelevant.

1    complaint, plaintiff filed its motion for partial summary judgment.  (Doc. Nos. 5, 10.)  If the Court

2    transfers to EDPA, the parties will have to rehash the summary judgment motion there and bring

3    local counsel up to speed on the issues.  Furthermore, the Court should not transfer a case on the

4    basis of docket congestion after determining the balance of the other factors weighs against

5    transfer.  Ellis v. Costco Wholesale Corp., 372 F. Supp. 2d 530, 544 (N.D. Cal. 2005); Stimson

6    Lumber Co., 229 F. Supp. 2d at 1085.

7    **C.      Conclusion**

8           The balance of factors weighs in favor of this Court's retaining jurisdiction over the case

9    and denying transfer to EDPA.  Because the Court retains jurisdiction, it decides plaintiff's motion

10   for partial summary judgment below.

11                              **MOTION FOR SUMMARY JUDGMENT**

12   **A.      Legal Standard**

13          "Under Rule 56(c), summary judgment is proper when the pleadings and discovery, read in

14   the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to

15   any material fact and that the moving party is entitled to judgment as a matter of law."  Armstrong

16   v. Burlington N. R.R. Co., 139 F.3d 1277, 1278 (9th Cir. 1998) (quoting 20th Century Ins. Co. v.

17   Liberty Mut. Ins. Co., 965 F.2d 747, 750 (9th Cir. 1992)); see also Anderson v. Liberty Lobby,

18   Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "the evidence presented is such that

19   a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff

20   or the defendant."  Anderson, 477 U.S. at 255.

21          Once the moving party meets the requirement of Rule 56, the burden shifts to the party

22   resisting the motion, who "must set forth specific facts showing that there is a genuine issue for

23   trial."  Anderson, 477 U.S. at 256.  It is not enough for the party opposing a properly supported

24   motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Id.

25   Genuine factual issues must exist that "can be resolved only by a finder of fact because they may

26   reasonably be resolved in favor of either party."  Id. at 250.  To make such a showing, the

27   nonmoving party must go beyond the pleadings to designate specific facts showing that there is a

28   genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

1   **B.       Choice-of-Law Analysis**

2           The Court has diversity jurisdiction over plaintiff's state-law contract claims.  In deciding

3   whether defendant breached the duty to defend, the Court must first determine which state's

4   contract law applies.  A federal court sitting in diversity must apply the choice-of-law rules of the

5   forum state.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Arno</u>, 22 F.3d at

6   1467; <u>Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.</u>, 12 F. Supp. 2d 1035, 1043 (C.D. Cal.

7   1998).  In contract law, California has two different choice-of-law tests, either of which may apply

8   to this action.

9           1.       California Civil Code § 1646

10          California's first choice-of-law test is statutory. According to California Civil Code § 1646,

11  "[a] contract is to be interpreted according to the law and usage of the place where it is to be

12  performed; or, if it does not indicate a place of performance, according to the law and usage of the

13  place where it is made."  Where, as here, the contract is silent regarding place of performance,

14  courts typically construe § 1646 to require application of the law where the contract was made.

15  <u>Arno</u>, 22 F.3d at 1468 n.6; <u>Sentex Sys., Inc. v. Hartford Accident & Indem. Co.</u>, 882 F. Supp. 930,

16  937 (C.D. Cal. 1995), <u>aff'd</u>, 93 F.3d 578 (9th Cir. 1996); <u>Int'l Serv. Ins. Co. v. Gonzales</u>, 194 Cal.

17  App. 3d 110, 121 (Cal. Ct. App. 1987) (Sims, J., concurring).  <u>But see</u> <u>Shannon-Vail Five Inc. v.</u>

18  <u>Bunch</u>, 270 F.3d 1207, 1210 (9th Cir. 2001) (construing statute to dictate application of the law of

19  the state where contract was performed, even where contract was silent regarding place of

20  performance).

21          A contract is "made" in the place of acceptance.  <u>ABF Capital Corp. v. Grove Properties</u>

22  <u>Co.</u>, 126 Cal. App. 4th 204, 222 (Cal. Ct. App. 2005).  The undisputed facts are defendant

23  delivered the Policy to Daymon, CDS's parent, in Connecticut.  (Memo. ISO MSJ, at 10.)

24  Daymon accepted the Policy on CDS's behalf in Connecticut (<u>Id.</u>), and this acceptance was the

25  last act necessary to give the Policy binding effect.  Therefore, the Policy was made in

26  Connecticut.

27          Defendant relies on two very old cases for the proposition that, despite § 1646, questions of

28  contract interpretation are governed by the law of the state of the contract's performance.  <u>Shippers</u>

1    Dev. Co. v. Gen. Ins. Co. of Am., 274 Cal. App. 2d 661, 674 (Cal. Ct. App. 1969); Blair v. N.Y.

2    Life Ins. Co., 40 Cal. App. 2d 494, 499 (Cal. Ct. App. 1940).  No court has cited Blair for the

3    place-of-performance rule since Shippers Development itself.[16]  The only district court opinion to

4    cite Shippers Development for the rule failed to make any reference to § 1646.  See Cont'l Cas.

5    Co. v. Fibreboard Corp., 762 F. Supp. 1368, 1379 (N.D. Cal. 1991), aff'd, 953 F.2d 1386 (9th Cir.

6    1992), vacated on other grounds, 506 U.S. 948 (1992).  More recent cases explicitly addressing §

7    1646, including the Ninth Circuit's opinion in Arno, applied the law where the contact was made

8    because of the contract's silence as to place of performance.  22 F.3d at 1468 n.6.

9    California's rules of statutory interpretation support the application of Connecticut law.

10   Although the first clause of § 1646 suggests a broadly sweeping place-of-performance rule, the

11   second clause makes clear that, when the contract says nothing about place of performance, the

12   controlling law is that of the place where the contract was made.  Because the clauses are

13   conflicting, the second, specific provision prevails over the first, general provision.  Cal. Civ. Proc.

14   Code § 1859; People v. Betts, 34 Cal. 4th 1039, 1058 (Cal. 2005).  The law of Connecticut, where

15   the Policy was "made," controls this case.

16        2.    Governmental Interest Test[17]

17        The second test is a common-law "governmental interest analysis" applicable in cases with

18   no choice-of-law clause.[18]  The first step in the governmental interest test is to "identify the

19   applicable rule of law in each potentially concerned state and [] show it materially differs from the

20   law of California."  Wash. Mut. Bank, FA v. Superior Court, 24 Cal. 4th 906, 919 (Cal. 2001).  If

21   the court finds the laws are materially different, the second step is to "determine what interest, if

22

23        [16] The Court disregards the citation to Blair in a dissenting opinion that has no binding effect
     on this Court.  See Lambros v. Metro. Life Ins. Co., 111 Cal. App. 4th 43, 52 (Cal. Ct. App. 2003)

24   (Mosk, J., dissenting).

25        [17] In conducting the governmental interest analysis, the Court declines defendant's invitation
     to follow the unpublished opinion of the Northern District of California, which relied exclusively on

26   § 1646 in its choice-of-law inquiry on a question of contract interpretation.  See Royal Indem. Group
     v. Travelers Indem. Co., No. C-04-00886 RMW, 2005 WL 2176896, at *4-*5 (N.D. Cal. Sept. 6,

27   2005).  The Royal case is unavailing to defendant anyway, because, in the absence of a specified place
     of performance, the court applied the law of the state where the contract was made.

28
          [18] The parties agree the Policy contains no choice-of-law clause.

1    any, each state has in having its own law applied to the case." <u>Id.</u> at 920.  If the state with the

2    materially different law has an interest in the application of its law, the third and final step is to

3    "select the law of the state whose interests would be 'more impaired' if its law were not applied."

4    <u>Id.</u>

5          This impairment analysis includes a determination of (A) each state's relative commitment

6    to its rule, (B) the history and current status of the different rules, and (C) the function and purpose

7    of those rules.  <u>Id.</u>  A court is not supposed to pick the "better" rule: nonetheless, all other things

8    equal, if one state's law "is archaic and isolated in the context of the laws of the federal union, it

9    may not unreasonably have to yield to the more prevalent and progressive law[.]"  <u>Offshore Rental</u>

10   <u>Co., Inc. v. Cont'l Oil Co.</u>, 22 Cal. 3d 157, 165 (Cal. 1978); <u>see</u> <u>Van Winkle v. Allstate Ins. Co.</u>,

11   290 F. Supp. 2d 1158, 1166-67 (C.D. Cal. 2003) (quoting in part).  The choice-of-law inquiry also

12   "considers each jurisdiction's relevant contacts with the parties, property and the incident involved

13   in order to compare the genuine interest of each jurisdiction in having its laws applied."  <u>Sierra-</u>

14   <u>Bay Fed. Land Bank Ass'n v. Superior Court</u>, 227 Cal. App. 3d 318, 331 (Cal. Ct. App. 1991).

15         In the ordinary choice-of-law inquiry, one party argues for the application of California

16   law, and the other party seeks to apply another state's law.  I.e., the choice is <u>between</u> the law of

17   California and another state.  The party advocating for the application of foreign law carries the

18   burden of proof.  <u>Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1006 (9th Cir. 2001)

19   (discussing <u>Hurtado v. Superior Court</u>, 11 Cal. 3d 574, 581 (Cal. 1974)).

20         This case is different because the Court must choose <u>among</u> the law of California and other

21   states.  Both parties advocate for the application of foreign law.  Defendant insists on the

22   application of Pennsylvania law.  Plaintiff believes that Connecticut law applies, but acknowledges

23   the Court could also apply California, Washington, or Massachusetts law—all leading to the same

24   favorable outcome.  In effect, the parties are asking the Court to conduct a five-state choice-of-law

25   inquiry.

26         To make the analysis more manageable, the Court will consider the law of three states:

27   Connecticut, Pennsylvania, and California.  The Court excludes Washington because plaintiff's

28   domicile has a minimal interest in the interpretation of a contract negotiated out of state between

two parties domiciled elsewhere. The Court excludes Massachusetts because the protection of the insured's reasonable expectations is paramount to the protection of the insurer's expectations. See Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 274 (Cal. 1966) (court must resolve uncertainties of policy language in insured's favor); Tana v. Professionals Protoype I Ins. Co., 47 Cal. App. 4th 1612, 1619 (Cal. Ct. App. 1996) (policy meaning based on insured's reasonable expectation of coverage). Therefore, as the place of insured CDS's incorporation, Connecticut's interest is paramount to that of Massachusetts, the domicile of the defendant-insurer. The exclusion of Washington and Massachusetts does not prejudice either party. Defendant concedes Connecticut and Massachusetts interpret employer's liability exclusions similarly (Def. Opp. to MSJ, at 10), and Washington law is likewise the same, Truck Ins. Exch. v. BRE Properties, Inc., 119 Wash. App. 582, 592 (Wash. Ct. App. 2003).

Furthermore, the Court assigns the burden of proof to defendant because Pennsylvania is the only state with a different legal rule from California. If this case presented a choice between California and Connecticut law, there would be no conflict of laws. See Offshore Rental Co., 22 Cal. 3d at 161-62 (involvement of two states does not present choice-of-law problem where the states' laws are identical). The Court must conduct a complete choice-of-law analysis because defendant argues for the application of a rule of law different from the California rule. Assigning the burden to defendant is, therefore, consistent with precedent. See ABF Capital Corp., 126 Cal. App. 4th at 215 (citing Washington Mutual Bank, 24 Cal. 4th at 919-20) (burden on party invoking rule of foreign law to show the foreign rule is materially different from California law).

Finally, in conducting the comparative impairment inquiry, the Court will consider Connecticut's interests and California's interests together. "When certain contacts involving a contract are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state." Restatement (Second) of Conflict of Laws ("Restatement") § 186 cmt. c (1971). The governmental interest test requires the Court to "focus[] on the 'comparative impairment' of the interested jurisdictions." McGhee v. Arabian Am. Oil Co., 871 F.2d 1412, 1422 (9th Cir. 1989). Therefore, even though Connecticut law is the same as California law, the Court must consider the

impairment of Connecticut's interests because Connecticut has a real interest in the outcome of this litigation. The combination of California's and Connecticut's interests to determine whether the Court will apply the California/Connecticut rule does not prejudice either party because California has a minimal interest in this case.

a.      *Material Difference*

A state's law is materially different from California law if application of the other state's law leads to a different result. Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc., 14 Cal. App. 4th 637, 645 (Cal. Ct. App. 1993). For over a half-century, California has interpreted employer's liability exclusions "to exclude coverage only in cases where the injured party is the employe[e] of the particular insured (whether named insured or additional insured) who is seeking protection under the policy." Pleasant Valley Lima Bean Growers & Warehouse Ass'n v. Cal-Farm Ins. Co., 142 Cal. App. 2d 126, 132 (Cal. Ct. App. 1956) (emphasis in the original); cf. United States v. Transp. Indem. Co., 544 F.2d 393, 396 (9th Cir. 1976) (citing Cal-Farm Ins. Co. v. Fireman's Fund Ins. Co., 54 Cal. App. 3d 708, 712 (Cal. Ct. App. 1976)). Applied to these facts, Mr. Kuo does not work for plaintiff, the insured seeking protection under the Policy. Therefore, under California law, the employer's liability exclusion in the Policy would not result in a denial of coverage to plaintiff for the Kuo litigation.

In Connecticut, where the named insured's employee sues an additional insured, the employer's liability exclusion does not preclude coverage if the policy also contains a severability clause. Sacharko v. Ctr. Equities Ltd. P'ship, 2 Conn. App. 439, 443-44 (Conn. App. Ct. 1984). Because Connecticut places greater reliance on the severability clause, Connecticut's and California's laws are not exactly the same. However, the laws are not "materially different" because each leads to the same result in this case. Specifically, because the Policy contains a severability clause, the employer's liability exclusion does not preclude defendant's duty to defend plaintiff in the Kuo litigation.

The remaining question is whether Pennsylvania's rule is materially different from the Connecticut/California rule. In a 1967 opinion, the Pennsylvania Supreme Court applied an employer's liability exclusion to deny coverage anytime an employee of a named insured sued any

- 20 -

entity insured by the policy.  <u>Pa. Mfrs. Ass'n Ins. Co. v. Aetna Cas. & Sur. Ins. Co.</u>, 426 Pa. 453, 455 (Pa. 1967) ("<u>PMA</u>").  Therefore, coverage would be denied even if the insured defendant was not the employer of the plaintiff employee.  <u>Id.</u>  Though the <u>PMA</u> policy contained a severability clause, an omnibus insured could not obtain coverage because the employer's liability exclusion barred coverage for bodily injury "of any employee of the Insured" and because the definition of "the Insured" included the named insured.  <u>Id.</u>  Applying <u>PMA</u> to these facts, the employer's liability exclusion would enable defendant to deny coverage because Kuo is an employee of a "named insured" (i.e., CDS).

According to plaintiff, however, Pennsylvania abandoned <u>PMA</u> when the Superior Court found an employer's liability exclusion did not bar coverage of a named insured for a lawsuit brought by the employee of another named insured.  <u>Luko v. Lloyd's London</u>, 393 Pa. Super. 165, 175 (Pa. Super. Ct. 1990).  The court distinguished <u>PMA</u>, in part, on the basis of a severability clause virtually identical to the clause in this Policy.  <u>Id.</u> at 176.  Even the <u>Luko</u> dissent acknowledged rules contrary to <u>PMA</u> in many other jurisdictions and agreed the employer's liability exclusion would not preclude coverage in the presence of a severability clause.  <u>Id.</u> at 180 (Wieand, J., dissenting).

Plaintiff's understanding of Pennsylvania law is at odds with the Third Circuit's conclusions in <u>Brown & Root Braun, Inc. v. Bogan Inc.</u>, 54 Fed. Appx. 542, 548 (3d. Cir. 2002).  Addressing the conflict between <u>PMA</u> and <u>Luko</u>, the Third Circuit followed <u>PMA</u> because a federal court sitting in diversity must apply the law as interpreted by the state's highest court.  <u>Id.</u> at 547-48.  A lower state court's criticism of the state supreme court's reasoning is "irrelevant" in the federal court's determination of the governing rule.  <u>Id.</u> at 547.  Specifically, the Third Circuit rejected the argument (which plaintiff repeats here) that <u>Luko</u> trumps <u>PMA</u> when the policy contains a more "modern" severability clause than the provision disregarded in <u>PMA</u>.  <u>Id.</u> at 549.

Because Pennsylvania still adheres to the <u>PMA</u> rule, Pennsylvania law is materially different from the laws of Connecticut and California on the scope of an employer's liability

1    exclusion.[19]

2          b.      Any Interest

3          Because of the material difference in law, the Court must determine whether each state has

4    an interest in the outcome of this litigation.  As the forum state, California has an interest in

5    applying its law to this case.  Rosenthal v. Fonda, 862 F.2d 1398, 1402 (9th Cir. 1988) (citing

6    Strassberg v. New Eng. Mut. Life Ins. Co., 575 F.2d 1262, 1264 (9th Cir. 1978)).  If Pennsylvania

7    has no legitimate interest in applying its law, the Court does not have "a true conflicts case" and

8    may apply California law.  Ins. Co. of N. Am. v. Fed. Express Corp., 189 F.3d 914, 921 (9th Cir.

9    1999) (quoting Offshore Rental, 22 Cal. 3d at 163).

10          As the site of the underlying loss and Kuo litigation, Pennsylvania has a sufficient interest

11    in the outcome of the case to satisfy this element of the choice-of-law test.  California law

12    acknowledges another state's interest in the application of that state's law where the events giving

13    rise to litigation took place within that state's borders.  Orr v. Bank of Am., NT & SA, 285 F.3d

14    764, 772 n.4 (9th Cir. 2002); Offshore Rental, 22 Cal. 3d at 168; Tucci, 89 Cal. App. 4th at 193.

15    Although each of these cases involved a tortious cause of action, the rule is similar for an

16    insurance coverage dispute.  See Stonewall Surplus Lines, 14 Cal. App. 4th at 648 (California had

17    interest in applying its law where risk was related to products that the insured manufactured and

18    retailed in California).

19          Plaintiff seeks to diminish the significance of the Kuo injury and litigation because the

20    legal issues in this coverage dispute are separate from the legal issues in Kuo's case.  This

21    distinction does not change the reality that, without the Kuo Complaint, this coverage dispute

22    would have never happened.  Therefore, the events giving rise to this case did take place in

23    Pennsylvania.  At a minimum, Pennsylvania has an interest in the application of its laws to

24    incidents within its borders.  Any argument plaintiff makes to minimize that interest belongs in the

25    

26          [19] In its reply, plaintiff draws a great deal of attention to defendant's efforts more than thirty-
     five years ago to persuade the Nebraska Supreme Court to adopt a rule similar to the law of California
27    and Connecticut, rather than the Pennsylvania rule.  (Def. MSJ Reply, at 1-2 (discussing Liberty Mut.
     Ins. Co. v. Iowa Nat'l Mut. Ins. Co., 186 Neb. 115, 118 (Neb. 1970).)  The Court does not find Liberty
28    Mutual's advocacy informative in this case.  The question at issue here is the rule of law in
     Pennsylvania; what Liberty Mutual would prefer the rule to be has no bearing on this case.

06cv2377

1    final step of the choice-of-law inquiry, i.e., the comparative impairment analysis.

2          Before beginning that analysis, the Court must establish Connecticut's interest in the

3    outcome of this case so the Court can consider the extent to which the failure to apply the

4    California/Connecticut rule would impair that interest.  Connecticut has an interest because CDS,

5    which obtained the Policy from defendant and had plaintiff added to the Policy as an additional

6    insured, is incorporated in Connecticut.  Furthermore, although CDS is not a party to this case

7    (yet[20]), the Court must interpret the Policy that a Connecticut corporation obtained through a

8    Connecticut broker and accepted in Connecticut.  Therefore, even if Connecticut's ties to CDS are

9    insufficient, Connecticut's ties to the Policy create a legal interest in this case.

10                    *c.*     *Comparative Impairment*

11         The Court finds the failure to apply California law would minimally impair California's

12   interests.  Both parties do business in California, and CDS has its principal place of business here.

13   Contacts with California unrelated to the cause of action, however, do not support the application

14   of California law.  McGhee, 871 F.2d at 1424 (citing cases).  Therefore, the Court focuses its

15   comparative impairment inquiry on the comparative interests of Connecticut and Pennsylvania.

16                    I.     RELATIVE COMMITMENT

17         The Court finds Connecticut is more committed to its rule than Pennsylvania.  The

18   Connecticut Supreme Court first announced its rule in 1984.  See Sacharko, 2 Conn. App. at 444.

19   More than two decades after Sacharko, no lower Connecticut court has criticized the decision or

20   undercut the rule.  To the contrary, lower Connecticut courts treat Sacharko as uncontroverted

21   black-letter law.  See Town of Manchester v. Vt. Mut. Ins. Co., No. CV044004859, 2006 WL

22   164886, at *4 (Conn. Sup. Ct. Jan. 3, 2006).

23         In Pennsylvania, by contrast, the Luko court disregarded PMA and interpreted an

24   employer's liability exclusion more narrowly to find the insurer owed a duty to defend.  Luko, 393

25   Pa. Super. at 176.  Luko found PMA had "no application to [the] case[.]"  Id.  The Luko dissent

26

27         [20] If defendant continues to fail to defend and indemnify plaintiff in the Kuo litigation, plaintiff
28   may sue CDS for breach of the CDS Agreement.  (Pl. Memo. ISO MSJ, at 19.)  Connecticut has an
     interest in protecting one of its corporations from such litigation.  The specter of a cross-claim against
     CDS validates Connecticut's interest in this case even though CDS is not a party to the action.

1   went further and acknowledged other states had "abandoned such a broad interpretation" of the

2   employer's liability exclusion.  Id. at 180 (Wieand, J., dissenting).  More than fifteen years after

3   Luko, the Pennsylvania Supreme Court has not responded to the criticisms leveled by its own

4   Superior Court against the PMA rule.  In particular, the Pennsylvania Supreme Court has not

5   addressed the viability of its rule in light of the clearer, more specific severability clauses

6   appearing in insurance contracts post-PMA.  Therefore, while PMA is still the law in

7   Pennsylvania, the subsequent attacks on that rule by Pennsylvania lower courts and changes in

8   insurance policy language manifest Pennsylvania's lesser commitment to its rule.

9                              II.     HISTORY AND CURRENT STATUS

10         In the current legal landscape, Pennsylvania belongs to a small minority of states that

11  interpret employer's liability exclusions broadly to bar coverage for lawsuits brought by

12  employees of any named insured.  The four other states interested in this litigation (California,

13  Connecticut, Massachusetts, and Washington) all have the opposite rule.  Defendant previously

14  defended plaintiff against CDS employee lawsuits in at least three other states (New Jersey, New

15  York, and Ohio).  (Lufkin Decla., ¶¶ 17-19.]  Because defendant believes the contract is governed

16  by the law of the state where the underlying loss occurred, those three states must also have

17  opposing rules.[21]  Furthermore, according to a district court opinion cited by plaintiff, six other

18  states (Colorado, Florida, Maryland, Minnesota, Texas, Virginia) interpret severability clauses in a

19  way that narrows the applicability of employer's liability exclusion to suits brought by employees

20  of the insured seeking coverage.  See Michael Carbone, Inc. v. Gen. Accident Ins. Co., 937 F.

21  Supp. 413, 418 (E. D. Pa. 1996).  In summary, this Court is aware of the laws of fourteen states,

22  and Pennsylvania is the only state with a rule that would deny plaintiff coverage for its defense of

23  the Kuo litigation.

24         Because Pennsylvania's law appears "archaic and isolated in the context of the laws of the

25  federal union," this factor weighs in favor of application of Connecticut's "more prevalent and

26  progressive" rule.  Van Winkle, 290 F. Supp. 2d at 1166-67; Offshore Rental, 22 Cal. 3d at 165.

27  In so finding, the Court does not address which rule is "better."  The Court's finding is limited to

28

_____

    [21] Else, defendant would not have provided coverage.

1  the determination that Connecticut's rule objectively reflects the law in most American

2  jurisdictions.

3                     III.     FUNCTION AND PURPOSE

4         Under Connecticut law, the "primary objective" of an employer's liability exclusion "is to

5  avoid duplication of coverage with an employer's workers' compensation coverage." Sacharko, 2

6  Conn. App. at 445.  When a policy includes a severability clause, the insurer undertakes "a

7  separate and distinct obligation to each insured under the policy". Id. at 444.  The severability

8  clause confines the scope of an employer's liability exclusion "to the employee of the insured who

9  seeks protection of the policy." Id.

10        The failure to apply Connecticut law here would disrupt the balance between the

11  severability clause and employer's liability exclusion and would give the exclusion a much greater

12  scope than Connecticut intended.  Connecticut's rule prevents insurance policies from upsetting

13  the bargain employers and their employees already struck in workers' compensation laws.

14  Therefore, employer's liability exclusions prevent private insurance from duplicating the effects of

15  a legal regime that preexists the policy.  I.e., the exclusion merely acknowledges background law.

16  Interpreting a employer's liability exclusion more broadly would transform the exclusion into a

17  substantive limitation on coverage.  Insurance policies contain severability clauses to make sure

18  such a transformation does not take place.

19        When the PMA court broadly construed an employer's liability exclusion despite a

20  severability clause, the court said it was "interpreting the unambiguous language of the contract."

21  426 Pa. at 457.  The Court did not refer to any larger policy considerations, and, in fact,

22  disregarded any "serious repercussions" of its holding on other areas of insurance law. Id.  The

23  court discussed the named insured's workers' compensation policy for its employees and reasoned

24  the named insured did not intend to purchase duplicative coverage for any third party that might

25  injure those employees.  Significantly, however, the Court failed to discuss the underlying policy

26  relationship between an employer's liability exclusion and severability clauses.

27        The failure to apply Pennsylvania law would have minimal effect on the function and

28  purpose of that law.  PMA is an exercise in contract interpretation that made no attempt to

1    reconcile its holding with larger policy considerations.  Even if Pennsylvania had a policy interest

2    in interpreting specific contract language a particular way, that interest is not impaired here

3    because the Policy's employer's liability exclusion and severability clause are written differently

4    from the comparable provisions in the PMA policy.

5          The PMA court's concern about overburdening the named insured's workers'

6    compensation program is inapplicable to these facts.  In PMA, the additional insured was seeking

7    coverage under the policy's omnibus coverage provision.  426 Pa. at 455.  A narrow construction

8    of that employer's liability exclusion would have opened the floodgates of litigation.  The named

9    insured's employees could exploit the omnibus provision to obtain multiple recoveries for on-the-

10   job injuries from entities unnamed in the policy.  These facts are different because plaintiff seeks

11   coverage as an additional insured explicitly mentioned in a Policy endorsement.  The CDS

12   Agreement's insurance and indemnification provisions prove CDS, unlike the PMA named

13   insured, intended coverage for CDS employees when they sued plaintiff under these

14   circumstances.  In summary, the facts and Policy language are sufficiently different here that the

15   Court's application of Connecticut law would not frustrate any underlying function or purpose of

16   the Pennsylvania rule.

17                          IV.    RELEVANT CONTACTS

18         This dispute arose because defendant insured product demonstrations CDS conducted in

19   plaintiff's warehouses within Pennsylvania.  As discussed supra, Pennsylvania has an interest in

20   the application of its law to conduct within its borders.  The application of another state's law

21   would undercut Pennsylvania's "vital interest in promoting freedom of investment and enterprise

22   within [its] borders",  Offshore Rental, 22 Cal. 3d at 168, and its interest "in predictably and

23   finally limiting liability," Tucci, 89 Cal. App. 4th at 193.  Specifically, defendant asserts failure to

24   apply Pennsylvania law would incentivize corporations employing Pennsylvania citizens not to act

25   as carefully as they should.  (Def. Opp. to MSJ, at 12.)

26         Connecticut also has relevant contacts to the incidents giving rise to this litigation.  First,

27   Connecticut's ties to the Policy are pervasive: here, plaintiff sues for coverage under a Policy that

28   a Connecticut corporation obtained through a Connecticut broker and accepted in Connecticut.

1   (Pl. Memo ISO MSJ, at 10.)  Besides the interest associated with applying its law to a contract

2   accepted within its borders, Connecticut has an interest in a contract interpretation for CDS (a

3   Connecticut insured) that protects its justified expectations and achieves "certainty, predictability

4   and uniformity of result".  Interface Flooring Sys., Inc. v. Aetna Cas. & Sur. Co., 261 Conn. 601,

5   612-13 (Conn. 2002) (quoting Restatement § 188 cmt. b).

6       Defendant asserts the best way to achieve certainty is to apply the law of the state where

7   the loss occurred and thus dispense with outcome-driven choice-of-law tests.[22]  Here, because CDS

8   performs product demonstrations in 208 of plaintiff's warehouses in thirty-two states, the Policy

9   would be subject to thirty-two different rules of law.  Defendant's argument contradicts "an

10  understanding that, barring extraordinary circumstances, only one state's law should govern an

11  insurance agreement."  Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 153 (2d Cir. 2003).

12  Numerous jurisdictions have articulated the same view as to insurance policies covering risks in

13  multiple states.  See Combs v. Int'l Ins. Co., 354 F.3d 568, 587 (6th Cir. 2004) (where risks

14  dispersed across state boundaries, location of any one risk "should make little difference"); Fallon

15  v. Superior Chaircraft Corp., 884 F.2d 229, 234 (5th Cir. 1989) (describing multistate application

16  of multiple states' laws as "an anomalous result [that] would wreak havoc in the insurance

17  industry"); Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co., 166 Ill. 2d 520, 527 (Ill. 1995)

18  (application of Illinois law necessary "to obtain a consistent interpretation of the policy" delivered

19  in Illinois to an Illinois corporation).

20      According to the Restatement, the "principal location of the insured risk," which is

21  ordinarily dispositive as to the law governing casualty insurance contracts, does not provide the

22

23  [22] Plaintiff repeatedly emphasizes defendant's failure to advocate vigorously for such a choice-of-law rule in other litigation.  Plaintiff's reply concludes with a Seventh Circuit citation in which Liberty Mutual's lawyer could not explain to the panel why Liberty Mutual would prefer to apply the

24  law of the state where the loss occurred.  (Pl. MSJ Reply, at 10 (discussing Horn v. Transcon Lines, Inc., 7 F.3d 1305, 1307-08 (7th Cir. 1993)).  After oral argument and with permission of the Court,

25  plaintiff supplemented its motion papers with a brief Liberty Mutual filed in the Supreme Court of Virginia in 1992, in which Liberty Mutual argued against the application of the law where the tort

26  occurred to insurance coverage disputes.  The Court takes judicial notice of plaintiff's supplemental filing but assigns minimal weight to Liberty Mutual's inconsistent positions.  More than a decade has

27  passed since Liberty Mutual argued those cases.  Furthermore, in response to the Court's question at oral argument, counsel for defendant explained that applying the law where the loss occurred would

28  avoid the expense of litigating choice-of-law issues and serve the interests of judicial economy.  These are legitimate explanations for defendant's position in this case.

governing law "where the policy covers a group of risks that are scattered throughout two or more states."  § 188 cmt. b.  If the location of the risk controlled here, the exact same Policy language would take on a different meaning in the various states, depending on what the law happened to be in the state where the loss occurred.

A hypothetical exposes the flaw with such an approach.  If the allegations in the Kuo Complaint remained exactly the same, except that Kuo's injury took place at plaintiff's warehouse in New Jersey, then, according to defendant's argument, New Jersey law would apply, and defendant would have to defend plaintiff against Kuo's lawsuit.  In other words, the meaning of the Policy would hinge on the random happenstance of where Kuo (or any other CDS employee similarly situated) happens to trip and fall.

Such a shotgun approach to choice of law puts CDS in the impossible position of trying to bargain for a nationally consistent level of coverage in a legal environment where no two states' contract laws are exactly the same.  CDS and plaintiff would have to research the laws of all the states where CDS performs product demonstrations to determine whether the Policy satisfies CDS's insurance obligations to plaintiff under the CDS Agreement.

Therefore, although defendant's approach would bring certainty to choice-of-law questions, it would result in correspondingly greater uncertainty on the ultimate legal issue, i.e., the meaning of Policy terms.  Black-letter law rejects such a trade-off.  Long ago, the California Supreme Court declared that a choice-of-law test based on location of the loss "must be subordinated to the objective of proper choice of law in conflict cases, i.e., to determine the law that most appropriately applies to the issue involved[.]"  Reich v. Purcell, 67 Cal. 2d 551, 555 (Cal. 1967); see Restatement § 6 cmt. j (simplicity of choice-of-law inquiry "should not be overemphasized, since it is obviously of greater important that choice-of-law rules lead to desirable results").

The Policy's failure to reference multiple states further bolsters the Court's decision to apply one state's law, regardless of where the loss occurred.  According to the Restatement, because the Policy insures against risks in multiple states, the Court could treat the case "as if it involved [multiple] policies, each insuring an individual risk" within a particular state. § 193 cmt.

1   f.  The California Court of Appeal applied the Restatement to hold that California law would apply

2   to a multistate excess insurance policy involving a Wisconsin insured that sold a defective

3   California-manufactured product to a California resident.  Stonewall Surplus Lines, 14 Cal. App.

4   4th at 648.  However, the insured in that case reasonably expected a court would apply the law of

5   the state where the loss occurred because the primary policy contained amendatory endorsements

6   for eleven different states.  Id. at 647-48.  This Policy, by contrast, contains only one state

7   amendatory endorsement: a Connecticut endorsement for cancellation and nonrenewal.

8   (Connecticut Changes–Cancellation and Nonrenewal.)  During negotiations, based on their prior

9   course of conduct,[23] the parties knew the Policy would cover nationwide activities and could give

10  rise to a duty to defend in many states.  In the absence of other state-specific endorsements, the

11  Court rejects the argument that the parties reasonably expected the law of multiple states to govern

12  the Policy interpretation.  To claim that CDS and defendant would agree to Policy language that

13  means different things in different states, when each party knew the Policy would govern conduct

14  in multiple states, is untenable.[24]  The Policy's explicit reference to Connecticut (and no other

15  state) supports the application of Connecticut law.[25]

16       Finally, applying Connecticut law will not materially impair Pennsylvania's interest

17  because the parties are disputing coverage, rather than compensation.  Maryland Casualty Co., 332

18  F.3d at 154; Employers Mut. Cas. Co. v. Lennox Int'l, Inc., 375 F. Supp. 2d 500, 507-08 (S.D.

19

20      [23] Before the Kuo litigation, defendant tendered plaintiff's defense of CDS employee lawsuits
    in three other states.  (Lufkin Decla. ¶¶ 17-19.)  Some of these tenders took place under prior policies
21  that also contained employer's liability exclusions.

22      [24] The Court's comparative impairment analysis reaches a result consistent with the
    Restatement.  Where the place of performance is unknown at the time of contracting, the most
23  important factors for choice of law are the place of contracting (i.e., acceptance) and the place of
    negotiations, especially when any of the contracting parties has ties to that place.  Restatement §
24  188(2)(a)-(b) & cmt. e.  Applied to this Policy, the performance obligation arises once a CDS
    employee sues plaintiff.  At the time of contracting, neither CDS, defendant, nor plaintiff knew the
25  place of performance because they did not know where CDS employees would bring their lawsuits.
    The remaining factors–the place of acceptance, the place of negotiations, and CDS's incorporation–all
26  point toward applying Connecticut law.

27      [25] Furthermore, the multiple-policy approach of Restatement § 193, comment f refers to
    instances where an insurance policy incorporates the statutory forms prescribed by various states.
28  This Restatement provision is inapplicable to standard-language policies, such as the Policy in this
    case.  Rouse Co. v. Fed. Ins. Co., 991 F. Supp. 460, 464 (D. Md. 1998); Cont'l Ins. Co. v. Beecham,
    Inc., 836 F. Supp. 1027, 1036 (D.N.J. 1993).

Miss. 2005). Above all else, Pennsylvania seeks compensation for its citizen Kuo (presuming he is entitled to compensation under Pennsylvania negligence law). Who cuts the check is considerably less important, because plaintiff and defendant are both national corporations capable of satisfying a judgment in a garden-variety tort case. Connecticut, by contrast, has a great interest in the coverage question because of Connecticut's ties to the Policy.

Returning to the hypothetical, Connecticut has an interest in the Policy's interpretation whether Kuo is injured in Pennsylvania, New Jersey, or anywhere else. By contrast, none of the individual states where CDS conducts product demonstrations has an interest in litigation arising from employee injuries in other states. Therefore, Connecticut has a pervasive, nationwide interest in the insurance contract, and any other state's localized interest arises only from the underlying tortious conduct that gives rise to the contractual dispute. See Van Winkle, 290 F. Supp. 2d at 1168 (applying New York law to suit by tort victims injured in California against New York insurer which issued the policy to a New York resident); see also Reich, 67 Cal. 2d at 554 (prohibiting application of law of the place where tort occurred, if that result "would defeat the interests of the litigants and of the states concerned").

### 3.   Conclusion

The Court applies Connecticut law because the contract was made in Connecticut and Connecticut is the state whose interests would be most impaired by the failure to apply its law.

## C.   Application of the Substantive Law

Connecticut's rule of law is clear and precisely on point. Where the named insured's employee sues an additional insured under a policy containing a severability clause, the scope of the employer's liability exclusion "is confined to the employee of the insured who seeks protection under the policy." Sacharko, 2 Conn. App. at 444. The Connecticut Superior Court recently relied on Sacharko in finding that an insurer breached its duty to defend the additional insured under a policy that contained both an employer's liability exclusion and severability clause. Town of Manchester, 2006 WL 164886, at *4.

Applied to these facts, although the Policy contains an employer's liability exclusion, it also contains a severability clause. Under Connecticut law, severability clauses effectively "'refer

1   to each insured as a separate and distinct individual apart from any and every other person who

2   may be entitled to coverage thereunder.'"  Sacharko, 2 Conn. App. at 444 (quoting Comm. Std.

3   Ins. Co. v. Am. Gen. Ins. Co., 455 S.W.2d 714, 721 (Tex. 1970)).  Here, the employer's liability

4   exclusion would deny coverage if Mr. Kuo sued CDS (his employer).  Because of the severability

5   clause, however, the Policy does not deny coverage for Mr. Kuo's lawsuit against plaintiff, an

6   additional insured.  Defendant owes a duty to defend, and defendant has not provided a defense.

7                                       **CONCLUSION**

8          Because transfer to the Eastern District of Pennsylvania would be neither more convenient

9   for the parties, more convenient for the witnesses, nor in the interests of justice, the Court

10   **DENIES** defendant's motion to transfer.

11          Because Connecticut law applies under both of California's choice-of-law tests, and

12   because Connecticut law limits application of employer's liability exclusions to the insured

13   seeking coverage, the Court **GRANTS** plaintiff's motion for partial summary judgment on its first

14   cause of action for breach of contract based upon defendant's failure to defend plaintiff in the

15   underlying Kuo lawsuit.

16          **IT IS SO ORDERED.**

17

18   **DATED:  January 24, 2007**

19

20                                       _IRMA E. GONZALEZ_

21                                       **IRMA E. GONZALEZ, Chief Judge**
                                         **United States District Court**

22

23

24

25

26

27

28